# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom Phillip
Joshua D. Uller
Kelly A. Welsh

22 East Mifflin Street
Suite 1000
Madison, Wisconsin 53703

Telephone 608-260-9900
Facsimile 608-260-9901

January 8, 2020

Honorable William M. Conley
United States District Court
120 North Henry Street
Madison, Wisconsin 53703

    Re:   *United States v. David Harris*
           Case No. 18-cr-113-wmc

To the Honorable William M. Conley:

    In anticipation of Friday's sentencing hearing, the defense submits this letter brief in support of the parties' joint-recommendation of fifteen years of incarceration.

    For me, this is a particularly difficult case. Over the past five years, I have handled many of the sex cases that have come before this Court, and I have a good sense of the issues that this Court will wrestle with in this one. They are likely many of the same that I struggle with. Rather than attacking the guidelines or simply recounting all the hardships in Harris's life, I hope that this brief reflection of how I see (and have experienced) this case will help persuade the Court that the parties' joint-recommendation of fifteen years is an appropriate sentence.

    When Harris was arrested in Nevada, I was called by the attorneys in the federal defenders office there. The lawyers told me about Harris, particularly his many deficits and struggles in pretrial detention between his initial appearance and his bond hearing. He had what they construed as a panic attack in Court and was given over to fits of tears in their meetings; he'd also been assaulted in the jail. He cut a sad picture, and they wanted to make sure he was taken care of. That was followed by a call from his former

Federal Defender Services
  Of Wisconsin, Inc.

Honorable William M. Conley
January 8, 2018
Page -2-

social worker, Janie Oustland, who was shocked at David's behavior and worried about what awaited him. She has written a letter to the Court. I decided to take the case; as he was shipped from county jail to county jail before arriving in Madison a month or so later, I would get frequent calls from Harris and Janie about his struggles.

Once he arrived, I spent a fair amount of time with Harris, getting to know him and acting more as a social worker than his attorney. We would talk through how to avoid being beaten up, why sometimes he shouldn't stick up for himself, and why he needed creative outlets beyond trying to watch a TV that he can't really see. By this, I don't mean to convey the sense that this was just a couple meetings: Harris has monopolized a great deal of our office's time and resources. I estimate that between myself and the two social work interns who have worked with him, we have spent well over 150 hours with him at the jail—that is to say nothing of his phone calls.

Some of this time spent with Harris was (to use a euphemism) maddening. In the beginning, there was a lot of talk about how he was "helping" these girls. He was angry and insistent. I wasn't having that talk. There would be times I just walked away, and then there would be productive meetings. Those would sometimes be followed by steps backwards before there would be some positive strides forward. The competency evaluation echoed this reality. R.20:8–9. It is, in fact, among the reasons I sought a competency evaluation.

At some point, as the months passed and I learned more about Harris and he'd open up more, the conversations weren't so much about him rationalizing what he'd done, but an examination of his life. This was particularly difficult. While the Court can see the broad strokes in the PSR, they take a on different weight as Harris talks about them in a visiting room at jail. There, he processed the pain that came from being shuffled between foster homes and group homes, being plopped in front of a TV or a computer, and the disappointment of never being wanted by a family. The competency evaluation summarized some of this reality well:

> More specifically, he recounted being frequently "plopped in a room to watch TV or play video games" over the course of his youth as a method of childcare, leaving no one to teach him the skills he would need in life. As a result of this dearth of social education, Mr. Harris shared, "I feel retarded…I feel stupid." In addition, he endorsed other emotional difficulties, such as becoming easily overwhelmed, experiencing rapid mood swings, being vulnerable to emotional stress and anxiety, having

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.

Honorable William M. Conley
January 8, 2018
Page -3-

> memory problems, and being chronically fatigued emotionally. He described times, particularly when under stress, when he has word-finding challenges and struggles to organize his thoughts.

*Id.* at 4. All of that is terribly difficult to talk through with a person who has been effectively ignored and passed along his whole life—a person who is coming to accept what that means as he faces at least fifteen years imprisonment. To be clear, he's nowhere near coming to terms with everything, he's in the beginning of a process. And to be clear, it's not always on a consistent upward slope: after he's been threatened or taunted, he struggles for days (even longer) to regain some inner composure and get back to the breathing and journaling that have been a help to him.

Walking through that with him, there are many ways to view Harris. At once, he stands as a sad reminder of someone who has been cast off since birth. Taken from his mom when he's born with cocaine in his system and the obvious effects of fetal alcohol syndrome, he was just stuck inside the system. And in the system, his anger grew and he wasn't given the guidance and support he needed to deal with his limitations and needs. He's a deeply hurt young man. But while he's definitely a deeply hurt and wounded young man, he's also someone who deeply, deeply hurt many young woman. His crime is just terrible. It's horrific. As a father and as a human being, you can't read the descriptions of what happened and not have your heart break. There's an obvious tension between what he's endured and what's done—both are in such extremes.

It's that tension and reality that I have struggled with. It's partly (if I'm honest) because I knew Harris before I knew the case's facts. And it was hard to know him and talk with him and come to grips with the person he is and then come to know what he did. I don't mean that in the sense of "he's a great church-going family man, how could he have defrauded anyone." I am rarely surprised anymore. Instead, it's that Harris is truly powerless and yet he was able to do this. As I struggled with this case, I processed it with a good friend, and he told me something that rings true: what Harris did was only possible on the internet, in the anonymity of it and with its protection against just how weak he was and is.

See on his own Harris couldn't even navigate fifty feet away from his group home; and those at the group home could just ignore him or beat him up. His power was limited to what he could do on the internet. Had Harris lived forty years ago, he would still have the same struggles in life but he wouldn't be here. He would be incapable of this crime— really, he'd be incapable of committing most serious crimes. His insecurities would have

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

Honorable William M. Conley
January 8, 2018
Page -4-

kept him from talking to any one and his utter impotence would have made it easy for them to walk away from him, or if they didn't just walk away for someone else to intercede and ask: why is this dude hanging around this sixteen-year-old? Without the internet, he couldn't take on the "Zero" persona, and he couldn't have hurt these girls. He would have just lived out his life within the group home's four walls. That's not to blame the internet for this crime or give Harris a free-pass that this was all an accident or a product of circumstance. It wasn't. It's a terrible crime. But accepting his inability to do anything to these or other girls away from the internet does contextualize this crime. Harris cannot (and could not) overcome the hurdles necessary to commit this sort of offense without it.

That's really where the dividing line that the Court has to draw between what Harris did and who he is. What he did is evil—no minimizing it. But who he is, well, that's something different. He's (again) an incredibly broken person. He's someone who has been dealt a hand that we'd usually only read about in some Dickens tale. He is saddled with not just physical limitations but mental as well. As one of his early evaluations notes:

> He becomes easily over stimulated leading to agitation and aggression. He also has difficulties making transitions...Per Dr. Willard's report, 'Behaviors that he exhibits to an exaggerated degree as compared to other children the same age include: impulsivity, low frustration tolerance, sudden acts of aggression, temper outbursts, sloppy table manners, anxiety, avoids reading and excessive swearing.' She goes on to state, 'Cognitive problems [Mr. Harris] exhibits to an exaggerated degree include: poor memory, not thinking logically, problems finding the right words, expressing thoughts and ideas, expressing emotions, poor awareness of time, poor understanding of the consequences of behavior, problems listening, does not learn from consequences, does not learn from experiences and gets lost easily.'"

R.20:5. Within all of that, his brokenness and his anger and his aggression found an outlet on the internet, targeting these young women. That is, he's not evil; he's broken and he's been ignored and he's been neglected and it's because of the accumulation of all that, that he did this very evil thing. Again, that doesn't excuse it, but it does frame the crime and it frames how I have come to see Harris and this case.

Federal Defender Services
   Of Wisconsin, Inc.

Honorable William M. Conley
January 8, 2018
Page -5-

     With that, it's important to mark some givens in the assumptions and arguments I am going to make for why this Court should follow the joint recommendation. First, Harris has real problems stewing and burning within him; he needs therapy (not just sex-offender treatment) but real intensive therapy to come to grips with his life and the hand he's been dealt. I hope that the Court will read the competency evaluation that was filed in this case. *See* R.20 It gives (in my view) an accurate sense of the person Harris is—warts and all. And it's better at explaining this than what I can do. He needs therapy to understand the dignity of others, and he needs therapy to understand how to endure what life has in store for him. I don't mean that in the sense of what he'll do *in* fifteen years, but what he'll do *for* the next fifteen years. In the past fifteen months he's been locked up, he's been beaten up three times and sexually assaulted. That will likely get worse when he gets to federal prison.

     Second, this sentence is not about deterrence or rehabilitation. This sentence is all about protecting the public and punishing Harris's crime. When it comes to protecting the public, Harris has to be away from the internet and his ability to manipulate women, both those who are minors and who are over 18. Full stop. It's only on the internet that society is at risk. In some ways with monitoring and conditions, society could be protected if Harris was returned to his group home, a place he can't leave. Not because the doors aren't locked but because he can't navigate fifty feet from the door. A probation agent making sure he doesn't have a phone or a computer would ensure that this sort of thing never happens again.

     But protecting the public is only part of the equation, there is also the issue of just punishment. I don't know what the precise number is that balances Harris's characteristics and history and deficiencies with what he did. But I think that fifteen years is more than enough. I think reasonable people could think anything between ten years and fifteen years, maybe even less—especially when the Court considers the difficulties that he will have in prison. Regardless, Congress has set the sentence at no less than fifteen years and the prosecution and the defense agree that fifteen years is the appropriate sentence. It reflects the crime's seriousness, it sends the message that this is never tolerated, and it assures the victims that what they suffered at Harris's hands is being redressed. At the same time, that sentence appropriately weighs the mountain of mitigation that Harris has in his favor. In sum, fifteen years stands as an appropriate sentence and the one that this Court should impose.

F<small>EDERAL</small> D<small>EFENDER</small> S<small>ERVICES</small>
    O<small>F</small> W<small>ISCONSIN</small>, I<small>NC</small>.

Honorable William M. Conley
January 8, 2018
Page -6-

  Attached to this brief is a letter from Mr. Harris. It will stand as his written allocution. I highly doubt he will speak at sentencing. He gets very agitated when he's moved from jails and put in the restraints; he also (as the competency evaluation notes) struggles with finding the right words and expressing ideas orally.

        Sincerely,

        /s/ *Joseph A. Bugni*

        Joseph A. Bugni
        Associate Federal Defender